168 P.3d 17

Calvin K. CHO, Hee Cho, David Cho, Tenny Cho, Karen Cho, and Sharon Cho, Petitioners/Plaintiffs–Appellants,

v.

STATE of Hawai'i,
Respondent/Defendant–Appellee.

No. 27458.

Supreme Court of Hawai'i.

Sept. 19, 2007.

Peter Van Nam Esser, Honolulu, and Mark S. Kawata, for petitioners/plaintiffs-appellants, on the application.

Robin M. Kishi and Caron M. Inagaki, Deputy Attorneys General, for respondent/defendant-appellee, in response.

MOON, C.J., LEVINSON, NAKAYAMA, and ACOBA, JJ., and Circuit Judge TOWN, in place of DUFFY, J., recused.

Opinion of the Court by MOON, C.J.

On September 7, 2007, this court accepted a timely application for writ of certiorari, filed by petitioners/plaintiffs-appellants Calvin K. Cho (Calvin), Hee Cho (Hee), David Cho (David), Tenny Cho (Tenny), Karen Cho (Karen), and Sharon Cho (Sharon) [hereinafter, collectively, the Chos] on August 6, 2007. The Chos requested that this court review the May 8, 2007 judgment of the Intermediate Court of Appeals (ICA), entered pursuant to its April 18, 2007 summary disposition order. Therein, the ICA generally "affirmed" the Circuit Court of the First Circuit's [1] August 25, 2005 first amended judgment, finding in favor of respondent/defendant-appellee State of Hawai'i (the State) as to all counts in the Chos' complaint.[2]

Briefly stated, the complaint in this case was filed by Calvin, a school custodian, and his family, *i.e.*, his wife, Hee, their two sons, David and Tenny, and their twin daughters, Karen and Sharon. The Chos sought damages for injuries allegedly caused by long-term exposure to lead, mercury, and arsenic during their ten-year occupancy of a government-leased cottage on the grounds of Washington Intermediate School, now known as Washington Middle School, located in Honolulu, Hawai'i. The complaint alleged negligence and breach of warranty of habitability of leased premises [hereinafter, breach of warranty] against the State. The central issue—challenged by the Chos both on direct appeal and on application—involves the trial court's authority to reconsider a discovery sanctions order three years after it was issued by the trial court. The sanctions order was imposed as a result of the State's failure to produce a fifty-five gallon drum, which contained debris collected from the now-demolished cottage, that was eventually shipped to a toxic dump site in Utah. The trial court initially sanctioned the State by barring it from contesting the contamination of the cottage. Three years later, the trial court, in granting the State's motion for reconsideration, essentially vacated its initial sanctions order and, instead, barred the State from introducing evidence of any tests it had performed on the debris contained in the drum. After a jury-waived trial, the trial court concluded that the Chos "failed to prove by a preponderance of the evidence that [the State] was negligent and/or any such negligence was a legal cause of [their] injur[ies]." The trial court further concluded that the Chos failed to prove their breach of warranty claim.

In their application, the Chos maintain that the ICA gravely erred when it affirmed the trial court's reconsideration of the initial sanctions order inasmuch as: (1) the time to file a motion for reconsideration under HRCP Rule 60(b) (2007), quoted *infra*, had passed; and (2) the State merely reargued issues already raised and heard by the trial

---

1. Unless otherwise stated, the Honorable Eden Elizabeth Hifo presided over the underlying proceedings. Further, the phrase "trial court" in this memorandum opinion specifically refers to Judge Hifo.

2. Although it ultimately agreed with the trial court's finding in favor of the State, the ICA vacated the August 25, 2005 first amended judgment and remanded the case to the trial court for, *inter alia*, reentry of judgment in favor of the State on all counts in the *complaint*. The ICA observed that the August 25, 2005 first amended judgment referred to the Chos' complaint as the "second amended complaint" when, in fact, the Chos filed only one complaint. Summary Disposition Order (SDO) at 11. However, the ICA concluded that such mistake did not render the August 25, 2005 first amended judgment non-appealable. SDO at 11. The ICA relied upon (1) *Garcia v. Oregon Department of Motor Vehicles*, 195 Or.App. 604, 99 P.3d 316 (2004), *aff'd*, 201 Or.App. 299, 120 P.3d 29 (2005), for the proposition that a "clerical mistake did not prevent 'entry' of judgment under pertinent statutes and thus judgment was enforceable and appealable" and (2) Hawai'i Rules of Civil Procedures (HRCP) Rule 60(a) (2007), which authorizes the trial court to correct clerical errors. SDO at 11–12.

court. The Chos also contend that the ICA gravely erred in affirming the trial court's dismissal of their claims because the trial court failed to address *all* of the elements of their negligence and breach of warranty claims.

Although we believe that the ICA erroneously failed to determine whether the trial court abused its discretion in reconsidering its initial sanctions order, we nevertheless affirm the ICA's May 8, 2007 judgment on appeal based upon the reasons discussed below.

## I. BACKGROUND

### A. Factual Background

Since 1975, Calvin worked as a custodian for the State Department of Education at Kalihi Uka Elementary School. In 1985, Calvin became the head custodian at Washington Intermediate School (the school). From April 1985 to the end of September 1995, the Chos lived in and rented—from the State for $50 per month—a two-bedroom cottage (the cottage) located on the school grounds that was made available for the school's head custodian.[3]

The cottage was built around 1920 and was located on property owned by the Boys and Girls Club of Hawai'i, which it leased to the State. According to the Chos,[4]

> when they moved into the cottage, it was dirty and had termites. The paint was peeling, the floors were stained, and the windows were painted over. The Chos patched the termite damage, painted the interior and exterior with paint supplied by the [s]chool, cleaned the floors, and scraped the windows.

SDO at 2.

In December 1989 (nearly four and a half years after the Chos moved into the cottage),

the State hired private architect Gerald Inouye to inspect the condition of all its custodial cottages. Inouye reported that the [c]ottage was well-cared for and "very clean," despite "some termite damages." The roof was considered "very old" and had "leaks," but no repairs were done by the State because "a new roof would have cost more than $3,000, exceeding available funds," and "exceeded the allowable repair amount per Department of Education policy of twice the annual rent[.]"

*Id.* (original brackets omitted). However, as a result of Calvin's subsequent requests for repairs, the State had its facilities maintenance employees inspect the cottage exterior to determine the economic feasibility of maintaining and repairing the cottage. During this inspection, which occurred on May 12, 1995,

> Steven Hong, a facilities maintenance employee of the Department of Accounting and General Services (DAGS), tested the exterior of the [c]ottage for lead paint. The strip test for lead paint was positive. The State determined that repair and maintenance costs would not be economically feasible and decided to demolish the [c]ottage. Calvin was notified by letter[, dated July 24, 1995,] that the rental agreement for the [c]ottage would not be renewed and that the Cho[s] must vacate by the end of August 1995. The letter did not disclose the results of the strip test for lead. The Chos asked for more time to move for stated financial reasons. The State gave the Chos until September 30, 1995 to vacate. The Chos vacated on or about September 30, 1995 and moved into a home they owned in Kapolei.[5] The

---

3. When the Chos moved into the cottage in April 1985, Calvin was fifty-one years old; Hee was fifty; David was twenty-one; Tenny was fifteen; and Karen and Sharon were thirteen.

4. The majority of the factual and procedural background are taken from the ICA's summary disposition order (SDO), which, in turn, relied upon the trial court's Findings of Fact (FOFs) and Conclusions of Law (COLs). The facts do not appear to be in dispute. Indeed, the Chos did not challenge on appeal before the ICA—nor do

they challenge on application to this court—any of the trial court's FOFs.

5. During the time they had rented the cottage, Calvin and Hee acquired two houses—one in Kapolei and another on Waiomea Street,—both of which they leased to tenants. The record also reflects that the Chos sold one of their houses in order to pay for the instant lawsuit. As Calvin testified, "I had to sell one house ... for the medical expenses and court expenses. And so

[c]ottage was demolished on or about January 18, 1996. [6]

*Id.* at 3–4.

On or about April 25, 1996 (three months after the demolition of the cottage),

> Calvin called the State inspector, who informed Calvin that the May 1995 strip test for lead was positive. Calvin immediately sought and obtained the report and began his own investigation. In early July of 1996, Calvin returned to the site of the [demolished c]ottage to collect samples of debris, paint chips, and water. It is unknown whether the debris and paint chips were from the interior of the [c]ottage. Calvin took the samples he collected to Inalab[, a toxicology laboratory,[7]] . . . for testing. The Inalab test of the paint chips indicated a high level of lead and a very low level of mercury. The Inalab test of the water indicated low and unremarkable levels of lead and detected no mercury.
>
> In July 1996, when their blood, hair, and urine tests indicated the presence of lead, mercury, and arsenic in their bodies, the Chos underwent chelation therapy to remove the metals from their bodies. At various times from 1996 through 2002, each of the Chos submitted numerous samples of their blood, hair, and urine for laboratory tests to determine lead, arsenic, and mercury content[, discussed more fully *infra* ].
>
> On October 4, 1996, the State had Brewer Environmental Services[, an independent testing company, (Brewer) ] collect wood, paint chips[,] and soil samples from the site of the demolished [c]ottage.... Tests of the [wood, paint chips, and soil samples] showed elevated but not hazardous levels of lead. Fifty-five gallons of debris from the former site of the [c]ottage were then collected in a drum and shipped

to a toxic dump site in Grassy Mountain, Utah.

*Id.* at 4–5.

### B. Procedural History

### 1. The Complaint and the Orders Compelling Discovery

On May 12, 1997, the Chos, proceeding *pro se,*[8]

> filed a complaint alleging that[,] "during the time they resided in the [cottage], the Chos were poisoned by lead and mercury through exposure to paint and other sources in the [c]ottage" and were seeking general and special damages caused them [sic] by the State's (1) negligence and (2) breach of warranty[.]

SDO at 5 (original brackets omitted). As previously stated, in early July 1996 (after the January 18, 1996 demolition of the cottage), Inalab, at Calvin's request, tested paint chips and water taken from the debris of the demolished cottage, which tests showed a low and unremarkable level of lead and no mercury in the water samples. The tests also revealed a high level of lead and a very low level of mercury in the paint chip samples. On June 2, 1997, three weeks after the filing of the instant complaint, Inalab tested water and paint chip samples for arsenic, which were negative.

On March 4, 1999, the Chos requested production of the "fifty-five gallon drum containing wood debris left from the demolition of the [cottage] ..., which Brewer ... collected, tested, and removed at [the State's] instruction[,]" for testing purposes. On July 14, 1999, the State filed a "motion to quash" the request, arguing that:

> The requested fifty-five gallon drum is buried in a landfill located [in] Grassy Mountain, Utah. The drum was placed in the Utah landfill at the administrative convenience of Brewer ..., and not at the direction of the State. Further, *the re-*

out of selling of the house, I am using that money for the court and the medical expenses."

**6.** The demolition was done by a company hired by the Boys and Girls Club of Hawai'i with the State's permission.

**7.** Inalab provided "services primarily in the fields of forensic toxicology, basic laboratory services, industrial hygiene, and environmental services."

**8.** Shortly after the filing of the complaint, the Chos retained counsel.

*quested item is not within the possession and control of the State [and, therefore, the cost of retrieval would be $15,000].*

(Emphasis added.) After a hearing, on September 20, 1999, the circuit court, the Honorable Gail C. Nakatani presiding, entered its written order, denying the State's motion [hereinafter, the discovery order]. Specifically, the discovery order stated that:

> THE COURT ... FINDS that it is satisfied that the [State] had actual knowledge that the [c]ottage was a cause and source of toxic exposure to the Chos. This fact is particularly evident by the exterior testing conducted on or about May 12, 1995. Instead of testing the cottage as recommended by Dr. [Ajit] Arora, [9] the State allowed the [c]ottage to be demolished and removed to a local landfill in February 1996. Subsequently, on October 25, 1996[,] a fifty-five gallon drum of [c]ottage debris was collected and eventually shipped to Grassy Mountain, Utah.
>
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the [State] shall be required to produce the fifty-five gallon drum at its own expense to [the Chos] in Hawai'i for testing purposes.

Thereafter, on September 28, 1999, the State moved for reconsideration of the discovery order, pursuant to HRCP Rule 60(b)(1) and (6) (governing relief from judgment, order, or proceeding for such reasons as "mistake, inadvertence, surprise, or excusable neglect"). The State essentially argued that it did not have knowledge that the cottage could be a cause and source of toxic exposure to the Chos when the fifty-gallon drum was shipped to Utah. To the contrary, the Chos responded that:

> The State has taken the position that the drum of construction debris was not toxic, yet, instead of merely storing it at a state facility, it went to the trouble of shipping the debris all the way to Grassy Mountain, Utah—a federally licensed toxic facility. There the drum was buried in a landfill under tons of soil and asbestos containing bags and containers[.] ... Upon further inquiry to management of the Grassy Mountain Facility in 1998, [the Chos]' attorney was advised ... that the drum could be recovered but it would cost approximately $150,000.00 [—as opposed to $15,000.00 initially stated by the State in its motion to quash—] in expense to do so[.]

On March 3, 2000, Judge Nakatani denied the motion, finding that the State

> sought relief pursuant to HRCP [Rule] 60; however, [the State] failed to demonstrate "mistake, inadvertence, surprise, or excusable neglect." In support of the motion, [the State] provided three affidavits [10] which could have been provided with its original motion and repeated the same arguments.

The State did not produce the fifty-five gallon drum.

**2. The Orders Imposing Discovery Sanctions**

■ On September 1, 2000, the Chos moved for sanctions under HRCP Rule 37(b) (2007) (governing sanctions for failure to

---

9. As discussed *infra*, Dr. Arora conducted an independent evaluation of Calvin in connection with his workers' compensation claim for chemical sensitivity. In his November 22, 1995 report (two months after the Chos vacated the cottage), Dr. Arora stated in relevant part that:

> [T]he most important aspect of Mr. Cho's care at the present time should be addressing his mercury poisoning, investigating his home environment, and getting the Health Department involved in figuring out who else is being exposed to mercury in his home environment and how. Once the mercury poisoning has been treated and his blood levels brought below 10 micrograms per liter, one would have to give a[t] least a year's worth of time before one could determine how much improvement

has occurred after treatment of mercury poisoning.

10. The State provided affidavits of: (1) Leslie K.L. Au, a toxicologist, which attested that "[l]ead paint on homes is not toxic to persons six years and older without active ingestion of quantities of large visible flakes of paint"; (2) Dr. Arora, who stated that, in his November 22, 1995 report (*see supra* note 9), he "did not intend that the State or any other public agency should conduct an investigation of the exterior or interior paint of the cottage, or any wood material used in the construction of the cottage resided in by Calvin"[;] and (3) Kevin Mizuno, who tested the soil and wood debris samples at the request of Brewer.

make discovery), requesting either an entry of a default judgment or a sanction barring the State from contesting the contamination of the cottage, pursuant to *Wong v. City & County of Honolulu*, 66 Haw. 389, 665 P.2d 157 (1983). Responding that retrieval would now cost $1 million, the State alternatively suggested that the trial court follow the *Wong* court by ordering that

> the State will be estopped from contesting the presence of lead, mercury or arsenic in the wood chips of the demolished cottage, but leaving it to [the Chos] to meet their burden of proof on these "facts" by competent evidence.

On December 22, 2000, the trial court entered an order, granting in part and denying in part the Chos' motion [hereinafter, the initial sanctions order]. The initial sanctions order specifically stated that:

> A. With respect to [the Chos'] request for default judgment, the request is denied.
>
> B. With respect to [the Chos'] request for an order [imposing sanctions against the State, the] request is granted as follows:
>
>> 1. [The State] was negligent in that it had a custodian [c]ottage which contained toxic chemicals, namely lead, mercury and arsenic ... from April 1985 to September 1995.
>>
>> 2. [The State] is estopped from claiming that the custodian [c]ottage [did not] contain[ ] toxic chemicals, namely, lead, mercury and arsenic, which were the byproducts of other substances which were the cause of the toxic chemicals in the custodian [c]ottage from April 1985 to September 1995.
>>
>> 3. [The State] is estopped from denying that the Chos have actually been exposed to a dosage within the established range for which there is an established causal relationship between exposure to the toxins[,] namely lead, mercury and arsenic, and the occur-

rence of disease from April 1985 to September 1995.

> 4. The State shall not be estopped from asserting its claims as to proximate cause, comparative negligence, assumption of risk or any other affirmative defenses against any other party in this action.

In other words, the initial sanctions order appears to have resolved the duty and breach of duty elements of negligence [11] in favor of the Chos, *i.e.*, finding that the State was negligent. As the Chos observed, trial was, therefore, to be limited to the remaining two negligence elements—causation and damages.

However,

> [o]n December 13, 2002, the State deposed Inalab president/lead toxicologist Mark Hagadone, Ph.D. Dr. Hagadone stated in his deposition that the laboratory tests conducted on the ... samples [that Calvin collected] showed non-hazardous levels of lead and "insignificant levels of arsenic and mercury."

On December 31, 2002, [two years after the initial sanctions order,] the State filed a ["non-hearing motion"] for [r]econsideration[, citing HRCP] Rule 60[, discussed *infra* ]. Eleven months later, on November 5, 2003, without a hearing, [the trial court] entered an order granting in part and denying in part the State's [motion for reconsideration (the amended sanctions order) ], implicitly vacating the [initial s]anctions [o]rder, and stating that:

> (1) The [trial c]ourt ... imposes the less severe sanctions which are set forth in [the] State's supporting memorandum at page 12, as follows: [D]uring the trial[,] the State is precluded from using Brewer Findings and Report; (2) only the Inalab findings are admissible; and[,] (3) at trial[,] the inference will be made that, if [the fifty-five gallon drum was] tested, the results would have been similar to samples that the Chos obtained and that were tested by Inalab.

---

11. It is well-established that, in order for a plaintiff to prevail on a negligence claim, the plaintiff is required to prove all four of the necessary elements of negligence: (1) duty; (2) breach of duty; (3) causation; and (4) damages. *Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 498–99, 923 P.2d 903, 915–16 (1996) (citation omitted).

On January 3, 2004, pursuant to HRCP Rule 68 [ (2007) (entitled, "Offer of settlement or judgment,") ] and Hawai'i Rules of Evidence, Rule 408, the State served on each of the Chos a $200 per person offer of settlement. All of the Chos rejected the offer.

SDO at 8 (original brackets omitted).

### 3. The Trial Proceedings

A jury-waived trial commenced on February 17, 2004 and ended on March 5, 2004. As discussed in more detail in the Discussion section, *infra*, numerous witnesses testified on behalf of the Chos, including, *inter alia*, medical experts, as well as each member of the Cho family, *i.e.*, Calvin, Hee, David, Tenny, Karen, and Sharon. The State also presented their own medical expert witnesses.

On the last day of the trial, March 5, 2004, the trial court ordered the trial bifurcated, informing the parties that it would first rule solely on liability and causation, and reopen for evidence of damages if the Chos prevailed. On April 5, 2005, the trial court issued its FOFs and COLs, finding in favor of the State. Specifically, the trial court found that:

> 59. There is no credible evidence of [the Chos]' toxic exposure to arsenic, lead or mercury from [the State]'s cottage.

> 60. There is no credible evidence of any physical or psychological injury to any of the [Chos] as a result of arsenic, lead or mercury from [the State]'s cottage.

> 61. There is no credible evidence of economic injury to any of the [Chos] as a result of arsenic, lead or mercury from [the State]'s cottage.

Consequently, the trial court concluded that:

> 1. [The Chos] have failed to prove by a preponderance of the evidence that [the State] was negligent and/or that any such negligence was a legal cause of injury to any [member of the Chos].

> 2. [The Chos] failed to prove their claims of breach of warranty of habitability ... as set forth in *Lemle v. Breeden*, 51 Haw. 426[, 462 P.2d 470] (1969) [12] or otherwise.

> 3. [The Chos] failed to prove any and all of their claims by a preponderance of the evidence. Therefore, judgment shall enter in favor of the [State] and against the [Chos].

■ The trial court entered judgment for the State on June 27, 2005. Thereafter, the Chos filed a notice of appeal on August 25, 2005.[13] Two days later, on August 25, 2005, the trial court issued its first amended judgment.[14]

**12.** The *Lemle* court recognized the application of the theory of implied warranty of habitability to residential leases, explaining that:
> It has come to be recognized that ordinarily the lessee does not have as much knowledge of the condition of the premises as the lessor. Building code requirements and violations are known or made known to the lessor, not the lessee. He is in a better position to know of latent defects, structural and otherwise, in a building which might to unnoticed by a lessee who rarely has sufficient knowledge or expertise to see or discover them.

*Id.* at 432–33, 462 P.2d at 474 (citation omitted) (format altered). The *Lemle* court further observed that, "[i]n considering the materiality of an alleged breach, both the seriousness of the claimed defect and the length of time for which it persists are relevant factors. Each case must turn on its own facts." *Id.* at 436, 462 P.2d at 476.

**13.** As the ICA noted:
> [T]he appeal is not timely if applied to the June 27, 2005 judgment[. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(1) (2007) ("When a civil appeal is permitted by law, the notice of appeal shall be filed within 30 days after entry of the judgment or appealable order."). H]owever, since the June 27, 2005 judgment did not identify the claim for which it was entered, it is not an appealable judgment under [Hawai'i Revised Statutes (HRS)] § 641–1(a) (1993), [HRCP Rule] 58[,] and the holding in *Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 119, 869 P.2d 1334, 1338 (1994).

SDO at 11 n. 5.

**14.** The Chos' August 23, 2005 notice of appeal is a timely appeal from the August 25, 2005 first amended judgment. *See* HRAP Rule 4(a)(2) (2007) ("If a notice of appeal is filed after announcement of a decision but before entry of the judgment or order, such notice shall be considered as filed immediately after the time the judgment or order becomes final for the purpose of appeal.").

## B. Appeal Before the ICA

On their direct appeal, the Chos contended that the trial court: (1) lacked jurisdiction to reconsider the initial sanctions order pursuant to HRCP Rule 60(b) when, *inter alia*, the time period to bring such motion had passed and the State offered no new evidence or arguments that could not have been raised previously; and (2) failed to make findings regarding *all* of the elements of negligence and breach of warranty claims.[15] On April 18, 2007, the ICA issued its SDO, essentially affirming the trial court's conclusions, discussed more fully *infra*. SDO at 13–14.

 On May 8, 2007, the ICA entered its judgment on appeal. The Chos timely filed their application on August 6, 2007.[16]

## II. STANDARDS OF REVIEW

### A. Writ of Certiorari

This court reviews the decision of the ICA for (1) grave errors of law or of fact or (2) obvious inconsistencies in the decision of the ICA with that of the supreme court, federal decisions, or its own decisions. HRS § 602–59(b) (Supp.2006).

### B. Motion for Reconsideration

 "The trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard." *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.*, 100 Hawai'i 97, 110, 58 P.3d 608, 621 (2002) (citation omitted). An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber*

*Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (1992) (citation omitted).

## III. DISCUSSION

On application, the Chos argue that the ICA committed grave error: (1) when it affirmed the trial court's decision to set aside the initial sanctions order and impose a lesser sanction against the State; and, (2) when it affirmed the trial court's dismissal of the Chos' negligence and breach of warranty claims without addressing all of the elements of those claims. We address each contention in turn.

### A. The Trial Court's Reconsideration of the Initial Sanctions Order

As previously stated, the trial court issued the initial sanctions order on December 22, 2000. Two years later, on December 31, 2002, the State filed its motion for reconsideration, citing HRCP Rule 60. Eleven months later, the trial court granted the State's motion, issuing an amended sanctions order on November 5, 2003 (nearly three years after the initial sanctions order). On appeal, the Chos challenged the trial court's authority to reconsider its initial sanctions order. Specifically, the Chos argued that the trial court erred in reconsidering its initial sanctions order because: (1) the time limitation to bring a motion for reconsideration under HRCP Rule 60(b) had passed, and, thus, the trial court was without jurisdiction; and (2) the State failed to adduce evidence that the matters raised in its motion for reconsideration could not have been raised in the earlier proceeding. However, the ICA, in its SDO, addressed only the first issue and made no mention of the latter. Specifically, the ICA—without analysis—summarily con-

---

15. The Chos also disputed the trial court's award of costs in the amount of $59,402.56 to the State. However, this issue is not challenged by the Chos on application. Nevertheless, we note that the ICA concluded that "the record is insufficient to determine what costs were included within the $59,402[.56] costs awarded" and, therefore, it declined to decide the validity of the award. SDO at 15. Consequently, the ICA remanded this issue to the trial court for an itemization of the costs the Chos were ordered to reimburse the State. SDO at 16.

16. On August 21, 2007, the State filed its response to the Chos' application. Therein, the State argues, *inter alia*, that the Chos' application is untimely inasmuch as the ICA's SDO was filed on April 18, 2007. HRAP Rule 40.1 (2007) provides in relevant part that "[n]o later than 90 days after the filing of the [ICA's] *judgment on appeal* . . ., any party may apply in writing to the supreme court for a writ of certiorari." (Emphasis added.) As previously indicated, the ICA's judgment was filed on May 8, 2007 and the Chos filed their application on August 6, 2007—the ninetieth day.

cluded that the trial court did not lack jurisdiction to enter its amended sanctions order, thereby replacing its initial sanctions order. SDO at 13. The Chos raise the identical issues in their application, which are addressed below.

### 1. Whether the Trial Court Had Jurisdiction to Reconsider the Initial Sanctions Order

■ The Chos contend that the trial court erred in considering and granting the State's motion for reconsideration and that the ICA gravely erred in affirming the trial court's decision to do so. Specifically, the Chos argue that:

First, the State's motion cited "Rule 60," but did not reference any section of the rule or authority interpreting it. *See Ditto v. McCurdy,* 103 Hawai'i 153, 80 P.3d 974 (2003) ("Ditto completely fails to argue or explain how any of the provisions of HRCP Rule 60(b) are implicated."). Moreover, "Rule 60(b) applies to motions seeking to amend final orders in the nature of judgments," *Tradewinds Hotel v. Cochran,* 8 Haw.App. 256, 262, 799 P.2d 60 (1990), and neither Judge Nakatani's [discovery order] nor Judge Hifo's [initial sanctions order] were final judgments or orders.

Second, assuming HRCP Rule 60(b) applies, the State's motion was based on mistake, new evidence and fraud, and therefore "shall be made . . . not more than one year after the judgment, order or pro ceeding was entered or taken." HRCP Rule 60(b)[.]

Third, assuming Rule 60(b)'s time limitations did not apply, this motion for reconsideration "failed to adduce evidence that such matters could not have been raised during the earlier hearing." *Bank of Hawaii v. Kunimoto,* 91 Hawai'i 427, 438, 984 P.2d 1253 (App.1997).

■ HRCP Rule 60(b) provides in relevant part that:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from *a final judgment, order, or proceeding* for the fol

lowing reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

(Emphasis added.) This court has noted that the HRCP do

not expressly afford a party the right to file a motion for reconsideration. *Cf.* HRAP Rule 40(a) [ ("Motion for reconsideration") ]; Hawai'i Family Court Rules Rule 59(b) [ ("New trials; reconsideration or amendment of judgment and orders") ]. Hawai'i appellate courts, however, have recognized that a motion for reconsideration can be filed pursuant to HRCP Rule 59(e) (motion to alter or amend judgment) or HRCP Rule 60 (motion for relief from judgment or order).

*Soderlund v. Admin. Dir. of the Courts,* 96 Hawai'i 114, 119 n. 7, 26 P.3d 1214, 1219 n. 7 (2001) (internal quotation marks and citation omitted). Nevertheless, the ICA has also observed that a motion for reconsideration, pursuant to HRCP Rule 60(b), "is authorized only in situations involving final judgments." *Crown Props., Inc. v. Fin. Sec. Life Ins.,* 6 Haw.App. 105, 112, 712 P.2d 504, 509 (1985); *see also Tradewinds Hotel, Inc. v. Cochran,* 8 Haw.App. 256, 262, 799 P.2d 60, 65 (1990) ("Rule 60(b) applies to motions seeking to amend final orders in the nature of judgments." (Citation omitted.)). Indeed, by its terms, Rule 60(b) only applies to a "final judgment, order, or proceeding."[17] This

17. Analogously, the Advisory Committee Notes

(1946 Amendment) for HRCP Rule 60's federal

court has defined "final order" to mean "an order ending the proceedings, leaving nothing further to be accomplished. Consequently, an order is not final if the rights of a party involved remain undetermined or if the matter is retained for further action." *Bocalbos v. Kapiolani Med. Ctr. for Women & Children*, 89 Hawai'i 436, 439, 974 P.2d 1026, 1029 (1999) (internal quotation marks and citations omitted). Clearly, an order imposing sanctions under HRCP Rule 37 for failure to comply with a discovery order, as here, is not a final order. *See Cunningham v. Hamilton County, Ohio*, 527 U.S. 198, 200, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999) (holding that an order imposing sanctions is not a final decision). Further, a final judgment or order had not yet been entered at the time the State filed its motion for reconsideration. As such, the initial sanctions order was merely interlocutory. Accordingly, relief pursuant to HRCP Rule 60(b) was not available in relation to the aforementioned sanctions order. *See also* Advisory Committee Notes (1946 Amendment) to the FRCP Rule 60(b) (observing that "interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires").

■ Moreover, as the State pointed out in its answering brief:

Rule 60 did not necessarily apply to [the trial court]'s [initial sanctions] order. It was not a final order and judgment had not yet been entered at the time the State moved for reconsideration. Rather, [the initial sanctions] order was interlocutory.

It is axiomatic that the trial courts retain inherent authority to revise interim or interlocutory orders any time before entry of judgment. *See Abada v. Charles Schwab & Co.*[,] 127 F.Supp.2d 1101, 1102 (S.D.Cal.2000). Interlocutory orders and rulings made pre-trial may be considered and reversed for any reason the trial judge deems sufficient, even in the absence of

new evidence or an intervening change in or clarification of controlling law at any time prior to final judgment when the initial order was clearly erroneous or would work manifest injustice.

We agree with the State to the extent that the trial court has inherent power to reconsider interlocutory orders. *See, e.g., Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir.1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment."); *Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir.1985) (motions for reconsideration of interlocutory order cannot be properly characterized as a motion under FRCP Rule 60(b); "[r]ather, the motion must be considered to be directed to the court's inherent power to modify or rescind interlocutory orders prior to final judgment") (citation omitted). "Of course, if the order [is] interlocutory, [the trial court] ha[s] the power to reconsider it at any time before final judgment." *Id.* (citation omitted). As another court stated:

Rule 60(b)'s primary purpose is to authorize the reopening of a *closed* case or a final order; however, a district court always has the power to modify earlier orders in a *pending* case without relying upon Rule 60(b). And, it is well established that a district court has the inherent power to reconsider interlocutory orders and reopen any part of a case before entry of final judgment. Moreover, this authority is not predicated on any federal rule, but emanates from the inherent power of the court. Not only is a motion to reconsider an allowable method of reviewing a prior order, it is the most appropriate and advantageous method of seeking relief from an interlocutory order for a party to pursue.

*Fisher v. Nat'l R.R. Passenger Corp.*, 152 F.R.D. 145, 149 (S.D.Ind.1993) (internal quotation marks, citations, and original brackets omitted) (emphases in original); *see also Greene v. Union Mut. Life Ins. Co. of Am.*,

counterpart, Federal Rules of Civil Procedure (FRCP) Rule 60(b), explained that "[t]he addition of the qualifying word 'final' emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief." *See*

also *Stallard v. Consol. Maui, Inc.*, 103 Hawai'i 468, 475, 83 P.3d 731, 738 (2004) ("As the [FRCP] are substantially similar to the HRCP, we look to federal case law for guidance.").

764 F.2d 19, 22 (1st Cir.1985); *cf. also* HRCP Rule 54(b) (2007) (providing that interlocutory orders that resolve fewer than all claims are "subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties"). Stated differently, the trial court possesses the inherent power to reconsider its initial sanctions order at any time prior to the entry of final judgment. Accordingly, the ICA correctly concluded that the trial court had jurisdiction to reconsider its initial sanctions order.

## 2. Whether the Trial Court Abused its Discretion in Reconsidering the Initial Sanctions Order

■■■ The Chos maintain that the trial court erred in reconsidering the initial sanctions order because the "motion for reconsideration failed to adduce evidence that such matters could not have been raised during the earlier hearing." (Internal quotation marks, citation, and original brackets omitted.) As previously stated, the ICA's SDO was silent with respect to this issue.

■■■ It is well-recognized that the trial court's inherent power to reconsider interlocutory orders, such as the initial sanctions order, at any time before final judgment is not without restrictions. Although the power of reconsideration is committed to the sound discretion of the trial court, *Ass'n of Apartment Owners of Wailea Elua,* 100 Hawai'i at 110, 58 P.3d at 621, a motion for reconsideration is limited in scope:

> [T]he purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion. Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding.

*Sousaris v. Miller,* 92 Hawai'i 505, 513, 993 P.2d 539, 547 (2000) (original brackets, inter-

nal quotation marks, citations, and footnote omitted).

Preliminarily, we reiterate that, in its memorandum in opposition to the Chos' motion for sanctions, the State argued that the fifty-five gallon drum

> is not within the care, custody or control of the State[,] and its retrieval under the circumstances is not practical [inasmuch as the cost to retrieve the drum was estimated at $1 million]. Further, the Department of the Attorney General does not have the ability to comply with the [discovery order] since its entire budget for litigation expenses for the current fiscal year is approximately $1.4 million[,] from which it must pay for all the litigation expenses for the year, with two specific case exceptions not relevant here; and the prior years budget was similarly limited. Further, the value of the instant case is less than [the] $1 million ... required to be spent in recovery of the drum.

The State further indicated that it is unaware of any

> statute waiving the State's sovereign immunity with respect to a court ordered sanction, let alone one for in essence one million dollars! It is evident that [the trial court] did not know of the cost of retrieval, since the only figures before her were for $15,000.00 initially, then $150,000.00 on the motion for relief from the [discovery order]. Therefore, th[e trial court] should not now insist on production, which [would] in essence be tantamount to a judicial abrogation of sovereign immunity and a judgment against the State for one million dollars.

Lastly, the State urged the trial court to fashion a sanction similar to the one in *Wong v. City & County of Honolulu,* 66 Haw. 389, 665 P.2d 157 (1983), in which this court affirmed a sanction that essentially estopped the City and County of Honolulu (the City) from claiming that a traffic signal control box was defective in design or manufacture,[18] stating that:

> lights were malfunctioning. 66 Haw. at 390–91, 665 P.2d at 159. In that case, the City was sanctioned for having destroyed the signal control box.

---

**18.** The *Wong* case involved a personal injury action commenced by a pedestrian and her parents against the City for injuries sustained by the pedestrian at a street corner at which traffic

[The trial] court could order that the State will be estopped from contesting the presence of lead, mercury or arsenic in the wood chips of the demolished cottage, but leaving it to the [Chos] to meet their burden of proof of these "facts" by competent evidence.

As previously indicated, the trial court's initial sanctions order, filed on December 22, 2000, provided that the State was estopped from, *inter alia,*

> [ (1) ] claiming that the custodian cottage contained toxic chemicals, namely lead, mercury and arsenic [and (2) ] denying that the [Chos] have actually been exposed to a dosage within the established range for which there is an established causal relationship between exposure to the toxins ... and the occurrence of disease from April 1985 to September 1995.

Two years later, on December 31, 2002, the State filed a motion for reconsideration, arguing that:

> Although [HRS] § 603–21.9 gives the courts authority to fashion appropriate sanctions, in HRS § 662–2, the State does not expressly waive its immunity from such sanctions. The [trial] court's order that the State had to provide the [fifty-five gallon drum of debris] at its own expense was tantamount to a monetary sanction. The order that the State had to provide the [drum] at a cost of $15,000 or more was tantamount to judicial abrogation of the State's sovereign immunity. An order that the State must provide [the drum] at a cost of approximately $1 million would be tantamount to judicial abrogation of the State's sovereign immunity.
>
> Similarly, [HRCP] Rule 37[,] which governs the types of sanctions that the courts may imposed for a party's failure to make discovery, prohibits the sanctions that were initially, and subsequently[,] imposed on the State in this case. HRCP Rule 37(e) provides in pertinent part:
>
> > **Expenses Against the State.** Except to the extent permitted by statute, expenses and fees may not be awarded against the State or a county under this rule.
>
> The [trial] court ordered the State to retrieve and produce the [drum] at its own expense. That order was an award of expenses. That order was contrary to Rule 37.

(Emphasis in original.) Further, the State contended that the initial sanctions were disproportionately severe inasmuch as, *inter alia,*

> the decision to demolish the cottage was made well before, and not because of, Dr. Arora's November 22, 1995 ... report regarding Calvin[.] Moreover, there is no evidence that there was any communication between the facilities personnel who made the decision to demolish the cottage, and those State attorneys who were handling [Calvin's] workers' compensation claim that would even suggest any intent to or gross negligence in not having [the debris] tested earlier for the heavy metals, or even suggest any deliberate spoliation of evidence that might arguably be critical to some lawsuit **that had not yet been filed.** Moreover, there is no evidence that ... Brewer asked the State for permission to send the [fifty-five gallon drum of debris] to Utah.

(Emphasis in original.) The State also attached excerpts from three depositions of (1) Dr. Hagadone, (2) Hong, and (3) Calvin. However, as the Chos argue—and we agree:

> [E]ven if the State's three deposition excerpts were "new evidence," it made no attempt to show such matters could not have been raised during the earlier hearing. [The Chos] filed their complaint in 1997, and the State did not take [Calvin]'s deposition until 2002. Stephen Hong found lead in the cottage walls in 1995, but was not deposed until 2001. The State listed Dr. Mark Hagadone as an expert witness in its January 11, 1999, pre-trial statement, 20 months before [the initial] sanctions hearing.

Based upon the foregoing, we believe the State's motion for reconsideration was an attempt to re-litigate the issues presented in its memorandum in opposition to the Chos' motion for sanctions. As indicated *supra,* a motion for reconsideration is not an opportunity for a party to present a better and more

compelling argument that the party could have presented in the original briefs. *See also Frietsch v. Refco, Inc.,* 56 F.3d 825, 828 (7th Cir.1995) ("It is not the purpose of allowing motions for reconsideration to enable a party to complete presenting his case after the court has ruled against him. Were such a procedure to be countenanced, some lawsuits really might never end, rather than just seeming endless."); *Official Comm. Of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 167 (2d Cir.2003) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." (Internal quotation marks and citation omitted.)). The State, therefore, failed to raise any arguments or offer any evidence that could not have been presented during the original motion for sanctions proceeding. *See State v. Honolulu Univ. of Arts, Sciences & Human-*

*ities,* 110 Hawai'i 504, 518, 135 P.3d 113, 127 (2006) (holding that the defendant "could and should have raised its … argument in its memorandum in opposition to the [plaintiff]'s motion for relief or at the hearing on the [plaintiff]'s motion for relief inasmuch as reconsideration is not a device to raise arguments that could and should have been brought during the earlier proceeding") (citation omitted).[19] Consequently, the trial court clearly exceeded its bounds of reason in reconsidering its initial sanctions order—three years after its issuance—to the substantial detriment of the Chos, whose case was delayed for trial for another year. *Amfac, Inc.,* 74 Haw. at 114, 839 P.2d at 26. Consequently, the ICA erroneously failed to address whether the trial court abused its discretion in issuing the amended sanctions order, via its grant of the State's motion for reconsideration.[20]

**19.** The State, in its response to the Chos' application, fails to address the aforementioned issue, *i.e.,* whether the trial court abused its discretion in granting its motion for reconsideration. The State does not explain how the arguments raised in its motion for reconsideration were not arguments that could have been raised in the previous motion for sanctions proceeding. In fact, the State attempts to reargue the sanctions matter in its response, contending—as it did before the trial court—that:

[The Chos] did gather and test their own samples of debris even before the State had gathered and tested samples, and therefore were not prejudiced in any way by the out-of-state storage, and inability to retest the [the fifty-five gallon drum]…. There was no evidence that the State deliberately destroyed or even sent [the drum] out-of-state. In fact, it was merely the fact that the cost of retrieving the [drum] was prohibitive.

**20.** The Chos, in their direct appeal, also argued that that the State's motion for reconsideration:

ignored the doctrine of judicial estoppel, and flatly contradicted the positions taken by predecessor counsel in his 2000 pleadings and hearing argument with regard to law of the case, sovereign immunity, [HRCP] Rule 55 [ (2007) (concerning default judgment) ], and the legality of Judge Hifo's [initial sanctions order]. Deputy Attorney General Charles Fell acknowledged that Judge Nakatani's orders were the law of the case, stipulated that the sanctions imposed did not violated [HRCP] Rule 55(e) [ (relating to default judgment against the State) ] or sovereign immunity, and admitted the State could have recovered the

drum for $15,000 if it has simply complied with Judge Nakatani's orders on time[.]

The Chos further asserted that the trial court's decision to grant the State's motion for reconsideration violated the law of the case doctrine in that "the State did not argue, and Judge Hifo did not find, that cogent reasons justified her decision to disregard the law of the case." The ICA, however, indicated that it would

not reach the question whether the [amended s]anctions [o]rder ignored the doctrine of judicial estoppel by allowing the State to contradict the positions its predecessor counsel had tak[en] in its 2000 pleadings and argument that led to [the trial court's] [initial s]anctions [o]rder.

[It would also] not reach the question whether the doctrine of the law of the case, *Querubin v. Thronas,* 107 Hawai'i 48, 60, 109 P.3d 689, 701 (2005), precluded [the trial court] from entering [its amended s]anctions [o]rder in place of her [initial s]anctions [o]rder.

SDO at 14. The Chos, on application, made the same arguments as it did before the ICA.

This court has recognized that the doctrine of "law of the case" is "a rule of practice based on consideration of efficiency, courtesy, and comity. Therefore, unless cogent reasons support the second court's action, any modification of a prior ruling of another court of equal and concurrent jurisdiction will be deemed an abuse of discretion." *Stender v. Vincent,* 92 Hawai'i 355, 362, 992 P.2d 50, 57 (2000) (internal quotation marks, citation, and original brackets omitted). Although, in light of the above discussion and conclusion, this court need not address these contentions, we observe that Judge Hifo did not in any way reconsider or reverse any of Judge Nakatani's orders. Rather, Judge Hifo was asked to

**B. *Failure to Address All of the Elements of Negligence and Breach of Warranty Claims***

The Chos argue that the ICA gravely erred in affirming the trial court's conclusions when the trial court failed to make adequate FOFs and COLs in that it did not address duty or breach of duty with regard to negligence, or the elements of breach of warranty. Specifically, the Chos maintain that the trial court failed to make

> findings about the State's duty to inspect, maintain or repair the cottage, or any breach of that duty. [The trial court] did not decide whether the State had a duty to inspect for toxic chemicals before [the Chos] moved in, or during their tenancy. [The trial court] did not decide whether the State was obligated to remove contamination if it was found, or make repairs. [It] did not decide whether the State had a duty to inform [the Chos] of lead contamination discovered by Stephen Hong. [It] did not decide whether the State was obligated to respond to [Calvin]'s requests for repairs, to tend to termites, to replace dissolving ceiling tiles, or to patch the leaky roof. [It] did not address the State's spoliation of evidence, or [the Chos]' argument that this destruction of evidence virtually guaranteed they would be unable to prove contamination.

As argued on direct appeal, the Chos believed that, "[a]bsent a finding of duty and breach, or 'negligent conduct,' there is no way a trier of fact can determine causation." Also, the Chos assert that the trial court erred in failing to address the elements of their breach of warranty claim.

On this point, the ICA asked and answered as follows:

> Are the Chos right that without deciding the other material elements of the two causes of action, [the trial court] was not authorized to decide the issue of causation

of damage? The answer is no. Assuming all of the other material elements of the two causes of action have been proven, one or more of the Chos must also prove that the breach of duty caused him, her, or them damage.

SDO at 13. We agree with the ICA's above conclusion. The Chos fail to present any authority requiring the trial court to also expressly address the duty, breach of duty, and breach of the warranty.[21] Therefore, the Chos fail to satisfy their burden of positively showing error committed by the ICA. Consequently, the ICA properly concluded as it did in connection with the Chos' aforementioned argument.

**C. *Disposition of the Instant Case***

In light of the above conclusion—namely, that the trial court abused its discretion in granting the State's motion for reconsideration,—it would appear that the case should be remanded to the trial court for a new trial. However, we observe that the State apparently contended on direct appeal that, irrespective of whether the trial court abused its discretion in granting the motion for reconsideration, "[t]here is ample support in the credible evidence of the court's findings and conclusions" regarding causation. As such, the State asserted that the appellate court "need not substitute its own determination of credibility, weight, and causation." In retort, the Chos argued that they had "not asked th[e appellate] court to do" so, as the State so contended, and, in fact, they did "not claim that insufficient evidence supported the trial court's ruling, but rather, the court failed to render adequate findings and conclusions," as discussed in section III.B. *supra*.

As previously discussed, the amended sanctions order is vacated inasmuch as the trial court inappropriately granted the motion for reconsideration. The initial sanc-

---

fashion a discovery sanction for the State's failure to comply with Judge Nakatani's discovery order. Indeed, the State asserts in its response to the Chos' application—as it did before the ICA—that:

> [The trial court] reconsidered [its] own, and not another judge's discovery sanction order.... [The trial court]'s order reconsidering

[its] initial [sanctions order] still impose sanctions on the State for non-compliance with Judge Nakatani's order.

21. We note that the trial court did conclude that the Chos "failed to prove their claim[ ] of breach of warranty of habitability[.]"

tions order, therefore, would be reinstated, resulting in the resolution of the duty and breach of duty elements of negligence in favor of the Chos. Consequently, the issues narrow to causation and damages. To this end, we believe that, based upon the evidence adduced at trial, the Chos have failed, as a matter of law, to demonstrate that their injuries were caused by their alleged exposure to mercury, lead, and arsenic during their ten-year occupancy of the cottage.

We have stated:

Generally, a court finding that is not challenged on appeal is binding upon this court. See *Bremer v. Weeks*, 104 Hawai'i 43, 63, 85 P.3d 150, 170 (2004) (holding that "findings of fact that are not challenged on appeal are binding on the appellate court"); *Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co.*, 91 Hawai'i 224, 239, 982 P.2d 853, 868 (1999) (holding that "findings of fact that are unchallenged on appeal are the operative facts of a case"); *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 252, 948 P.2d 1055, 1093 (1997) (stating that "if a finding is not properly attacked, it is binding; and any conclusion which follows from it and is a correct statement of law is valid" (quoting *Wisdom v. Pflueger*, 4 Haw.App. 455, 459, 667 P.2d 844, 848 (1983))).

*Kelly v. 1250 Oceanside Partners*, 111 Hawai'i 205, 227, 140 P.3d 985, 1007 (2006) (ellipsis and brackets omitted). Moreover, we observed that:

"It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." *State v. Jenkins*, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) (citations and internal quotation signals omitted) (brackets in original); *see also LeMay v. Leander*, 92 Hawai'i 614, 626, 994 P.2d 546, 558 (2000) ("This court has long observed that it is within the province of the trier of fact to weigh the evidence and to assess the credibility of witnesses, and this court will refrain from interfering in those determinations.") (Citation omitted.).

*In re Doe*, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) (ellipsis and brackets omitted).

Bearing the aforementioned principles in mind, we examine the facts of this case.

Initially, we observe that the Chos do not challenge—either on application or on direct appeal—any of the FOFs entered by the trial court on April 5, 2005. Specifically, the relevant unchallenged FOFs, which are binding upon this court, reveal the following:

### Calvin Cho—Pre-cottage

24. Medical records from Kaiser Permanente [ (the Kaiser records) ], beginning in 1971, show that before [the Chos] moved to the cottage ("pre-cottage"), Calvin ... regularly sought treatment for numerous minor ailments. These include treatment for colds, flu, fall, contusion, muscle strain, nasal congestion, worm, headache, dizzy spell, itchy eye, sore throat, episode of gastroenteritis, gas pain, stomach ache, palpitation, [and] episode of diarrhea.

25. As early as the mid–1970s, Calvin ... had been diagnosed with recurring allergies, itchiness, rashes, dermatitis, athlete[']s foot over his body, hearing loss, low back problems, repeated episodes of headaches, dizziness, chest pain, gas, and stomach pain. He also had been diagnosed with high blood pressure.

26. As early as the mid–1970s, he began to experience back and leg pain due to a number of back injuries.

27. As early as the mid–1970s, Calvin ... had fears of being poisoned. In the Kaiser records, the May 5, 1976 entry stated that Calvin ... reported that he suspected that someone had tried to poison him by contaminating his tea, and therefore he wanted his tea tested for poison.

28. Some two years later[,] the December 20, 1978 entry stated that he was convinced that some kind of poison was affecting his eyes.

29. The January 26, 1979 entry stated [that Calvin] was convinced a former co-worker was trying to poison him.

30. As early as the mid–1970s, Calvin ... reported a long history of marital difficulties with his wife[, Hee]. In the Kaiser records, the June 13, 1977 entry stated that he had fights with his wife about her

lying to him and hiding paychecks. He said that his wife's family was crazy.

### Calvin Cho—During cottage

31. In December 1988, Calvin ... filed a workers' compensation claim arising from his concerns that he had been exposed to asbestos in the work place. He was seen by occupational medical expert John Endicott, M.D. at Straub Clinic & Hospital who detected no asbestos related disease.

32. Dr. Endicott again saw [Calvin] on May 16, 1990, regarding [his] concerns of chemical poisoning at work due to the use of organophosphate pesticides. There were no physical signs, and the laboratory tests were normal. Dr. Endicott concluded the symptoms were purely psychosomatic after [Calvin] reported feeling better because of his mistaken belief the phlebotomist had injected medication when drawing [his] blood.

33. In December 1990[,] Calvin ... began seeing allergist Dr. [George] Ewing for chemical sensitivity to organophosphate materials at work. In the doctor's December 14, 1990 report[,] he concluded that [Calvin] was "generally and exceedingly healthy" despite a myriad of complaints. Dr. Ewing referred [Calvin] for evaluations regarding those complaints, some of which comprise his alleged injuries in this action.

34. In considering Calvin['s] complaints of numbness, tingling and pain in his legs, [n]eurologist James Pierce, M.D. diagnosed [Calvin] with a mild neuropathy, the most common causes of which were diabetes and alcohol consumption. Dr. Pierce thought the condition was stable and should not progress. At trial[, Calvin] denied heavy drinking and in 1991 had told Dr. Ewing [that] he was compliant with his orders to stop and at the same time told Dr. Pierce he had drank no more than 2 beers and not every day. Earlier medical records contain a history of daily drinking for more than 20 years.

35. Urologist Gary Lattimer, M.D. addressed Calvin['s] complaints of decreased libido and erectile dysfunction. At trial[,] Dr. Lattimer testified that the laboratory results were within normal limits for [Calvin]'s age and that he had no opinion as to the cause of [Calvin]'s complaints. He had earlier (1999) declined to give any rating for workers' compensation purposes. At that time[,] the reported impotence, for which [Calvin] declined to undergo objective testing, and the mild neuropathy were being explored in connection with [Calvin]'s workers' compensation claim for exposure to pesticides. Indeed, Dr. [Richard] Lau's reports record [Calvin's] history of erectile dysfunction dating back to [his] 1978 back injury[,] which [Calvin] at trial said was inaccurately reported history.

36. On January 31, 1991, Dr. Ewing referred Calvin ... back to Dr. Endicott. In his February 20, 1991 entry, Dr. Endicott indicated that the laboratory tests he ordered showed "borderline abnormal mercury level in the blood of 47 ug/L," but that lead and arsenic had not been detected. Dr. Endicott further noted that Calvin ... does "ingest seafood on a regular basis" and concluded that the likely source of the mercury was contaminated seafood, although other sources were possible. Other sources suggested to [Calvin] at trial included his teeth because he had a lot of silver amalgam dental work.

37. Dr. Ewing then referred Calvin ... to physical medical and rehabilitation specialist Gary Okamoto, M.D. Dr. Okamoto reiterated Dr. Pierce's early diagnosis of peripheral neuropathy in the legs, and possibly in the arms, as a result of repeated exposure to organophosphate chemicals at work.

38. In connection with Calvin['s] workers' compensation for chemical exposure, he was evaluated by neurologist John Henrickson, M.D. In his June 4, 1991 report, Dr. Hendrickson concluded that the peripheral neuropathy was not the result of exposure to organophosphate chemicals, but instead was possibly due to mercury poisoning.

39. Contrary to the allegation made in this case that the cottage was the source of lead, arsenic and mercury poisoning, when Calvin ... was away from work because of the alleged work injuries, and therefore

necessarily spending more time at home, according to Drs. Ewing and Okamoto, Calvin['s] condition was actually improving.

40. In connection with the workers' compensation claim for chemical sensitivity, Calvin ... was evaluated by allergist Stuart Rusnak, M.D. In his November 8, 1991 report, Dr. Rusnak concluded that the peripheral "neuritis" was related to Calvin['s] chronic alcohol consumption and long-term treatment by Fulvicin for his athlete[']s foot, rather than related to any sensitivity to chemicals in the work place. Rusnak testified at trial to the same effect. The [c]ourt finds this testimony credible and persuasive.

41. Dr. Ewing nevertheless maintained in December 1991 that Calvin['s] condition was a result of the work place. In the end[,] the State denied [Calvin]'s workers' compensation claim, and he became embittered by that litigation.

42. By August 1992[,] Dr. Ewing determined [that Calvin] had sufficiently recovered from the toxic effects of chemical exposure to return to full time work after one and a half years. The first day he returned to school, September 1, 1992, [Calvin] sought emergency treatment for "burning eyes[,] shortness of breath and bilateral chest pain" due to alleged exposure to toxic fumes from a broken bottle containing chemicals. The next day, Dr. Lau found him normal at a follow-up visit and [Calvin] filed a new workers' compensation claim.

43. Because of the incident at work, Dr. Ewing had a dialogue with [the] school administrator in 1992 and 1993 about what Calvin ... could and could not do at work.

44. On August 30, 1994, Calvin ... sustained a back injury at work. Dr. Lau treated [Calvin] for that injury and in May 1999 opined [that Calvin] could not return to work. [Calvin] took disability retirement in connection with the back injury when informed the State would otherwise terminate him effectively July 30, 1999. In a post retirement entry ordering a diagnostic MRI for back pain, Dr. Lau notes of [Calvin]: "Unfortunately many of the physical exam findings are subjective and difficult to quantify."

45. At trial[,] there were objective evidence of blood and other testing for heavy metals in [Calvin]. On January 18, 1991, [Calvin]'s blood test results detected no lead and no arsenic.

46. While he lived in the cottage, Calvin ... had several blood samples tested for mercury. The levels detected in his system fluctuated....

Moreover, in connection with one of his workers' compensation claims for chemical sensitivity, FOF No. 15 provided that Calvin was evaluated by Dr. Arora, who

concluded that Calvin['s] symptoms were the result of mercury poisoning. He suggested that the source of the mercury was in the home environment, probably due to Calvin['s] self-medication with Asian folk remedies as well as to his diet. [22]

With respect to the Chos' conditions postcottage period, the unchallenged FOFs revealed at follows:

47. Dr. Ewing, in his September 20, 1996 letter to Dr. Lau, noted that Hee[']s] mercury levels were normal and that he was "not convinced, personally, that either of these people[, i.e., Calvin and Hee,] have any significant evidence that we could relate to mercury or lead even though [Calvin] is insistent that this may be the problem."

48. Calvin ... also insisted that his family members be treated for heavy metal

___

22. Specifically, Dr. Arora indicated that test results demonstrated that the level of lead in Calvin's blood was "normal at 1.9 micrograms per deciliter" and that his mercury level "was significantly high at 31.9 micrograms per liter, the normal being less than 10 micrograms per liter." Dr. Arora stated that,

beyond reasonable doubt, [Calvin] has been exposed intermittently to mercury in his home environment.... The source of mercury exposure at home could be food, certain hobbies (for example, antique cleaning and polishing with metallic mercury), home remedies, old antique furniture treated with mercury-containing fungicides[.]

However, Dr. Arora concluded that "the question of mercury exposure [in the workplace] does not even remotely arise. There is no cleaning chemical that contains mercury and the insecticides used by [Calvin] were non-mercury compounds."

poisoning, and they underwent a course of chelation therapy normally reserved for acute toxic exposure. At trial[,] expert testimony proved the treatment was unnecessary and inadvisable because of the attendant potential side effects of the bonding agents used.

49. In connection with the chemical exposure claim, in his June 8, 1997 report, occupational medicine specialist Leonard Cupo, M.D. concluded that Calvin['s] symptoms are not indicative of lead or mercury poisoning. He reiterated that Calvin ... never had elevated lead levels. He further concluded that the fluctuating elevated mercury levels were due to diet.

50. Dr. Cupo followed that report with another dated September 30, 1997, in which he summarized the records he reviewed, and reiterated his opinions regarding lead and mercury. He also addressed the issue of arsenic. He concluded again that the most likely source of the slightly elevated arsenic level was diet.

51. After the family left the cottage, [the Chos] had their blood, hair and urine samples tested for lead, arsenic and mercury[, which tests showed fluctuating, and even increasing levels of these metals years after the Chos moved out of the cottage.]

52. [The Chos] retained expert toxicologist Edward Massaro, M.D., who concluded that the family was subjected to long-term low-level cottage exposure of lead, arsenic and mercury that they ingested, inhaled and absorbed by skin contact. He also concluded that all family members have various medical conditions some of which manifest as irritability and psychological or mental deficits as a result of the exposure.

53. *At trial, Dr. Massaro and other witnesses [for the Chos] failed to provide credible bases for their opinions including no consideration of [Chos'] pre-cottage medical records, no credible explanation of post-cottage sample tests showing exposure levels, and no credible explanation of the method by which cottage contact allegedly occurred. They opined that [the Chos]' inhalation, ingestion, and skin con-tact of termite feces containing heavy metals from the cottage paint and wood eaten by the insects was the method of exposure to lead, mercury, and arsenic. Dr. Massaro was not a persuasive witness, and the court rejects his opinions.*

54. *In contrast, the State's expert toxicologist, Robert Tardiff, Ph.D., credibly testified within reasonable scientific probability that none of the [Chos] were exposed to lead, arsenic or mercury from the cottage and any symptoms or ailments they had or claimed to have were not caused by cottage exposure. Dr. Cupo credibly testified to the same effect. The scientific bases include[,] inter alia[,] the known 1/2 life of the applicable heavy metal in human hair, blood and urine, the actual sample testing results of [the Chos], and the complete medical records of [the Chos].*

55. The [Chos]' medical records (beginning with Kaiser in 1971 for all except the twins which begin at their later birth) are voluminous and include many referrals within Kaiser, within the workers' compensation system, within the no-fault automobile insurance system and others chosen by [the Chos] for forensic purposes in connection with this litigation. *The medical records evidence[:] (a) the lack of complaints during the cottage period which contrast with [the Chos]' testimony that they experienced such ill health; and (b) pre-cottage complaints and diagnoses that are pre-existing medical conditions likely to cause any legitimate later complaints.*

56. *Indeed, the medical records of the [Chos] do not support their claims. For example, Hee['s] pre-cottage records[, beginning in 1971,] contain myriad complaints of headaches, respiratory problems including emphysema, marital problems including domestic violence, conjunctivitis and body rashes. At trial[,] she testified the pre-cottage records were wrong. (They would have to be for her litigation claims to have credibility.) The [c]ourt however finds the medical records are more accurate contemporaneous written documentation by medical providers than the trial*

recollections of the witnesses and therefore discredits [Hee's] testimony[.]

57. Likewise, the complaints of Karen and Sharon ... regarding headaches, loss of memory and the like are, if they existed at all, related to the December 10, 1993 motor vehicle accident[, discussed infra].

58. Calvin ... unsuccessfully litigated workers' compensation claims regarding asbestos and chemical sensitivity and guided his daughters to exaggerate any 1993 motor vehicle accident injuries they may have sustained. He required his family to undergo heavy metal testing and chelation treatment and mandated his children undergo fertility testing for this case, while investing thousands of his own money to obtain expert opinions based on selective records he provided in hopes of recovering money damages in this case. His actions are consistent with secondary gain motivation, and his testimony regarding injuries and damages is not deemed credible by this [c]ourt.

(Emphases added.) Moreover, as aptly and correctly summarized by the State in its answering brief, the medical records of the Cho children revealed the following:

### 1. Pre–Cottage

The [Kaiser] records showed that David ... had a history of palpitations, and frequent visits for psychosomatic symptoms. His pre-cottage school records indicated below average aptitude and poor grades. He dropped out of high school, and did not graduate.

Tenny['s] Kaiser records ... is only interesting for its December 1, 1972 entry[,] which stated that his father reported that he felt his son was "slow," and for its February 23, 1974 entry[,] which documented a head injury and post-injury headaches. His pre-cottage school records indicated below average to average aptitude in vocabulary, reading, spelling, language, and below average to above-aver-

age aptitude in math. His grades were average to above average at best.

Karen ... experienced a variety of minor ailments ranging from itchy eyes, colds, coughs, bronchitis, fever, stomach aches, vomiting, oral sores, rashes, and pinworms. The most noticeable entry in the Kaiser records was on August 23, 1983[ ] that indicated [that she] was underweight and had mild scoliosis. Her school records clearly indicated that her pre-cottage aptitude for vocabulary was at the lowest, reading was below average, and some of her math aptitude levels were also below average. The records also showed that some [of her] math levels were low average and spelling was low average.

Like her twin, Sharon['s] records indicated a variety of ailments, abdominal pain, poor eating habits, as well as parental reports of her odd behavior. Also like her twin, Sharon['s] school records clearly indicated that pre-cottage aptitude for reading vocabulary, and language were below average, and that spelling and math aptitude were at most average.

### 2. During Cottage

The records were devoid of any complaints compatible with lead, arsenic or mercury poisoning by the children during the period that the [Chos] lived in the cottage. In fact, Tenny ... did not seek medical care for any reason until his father directed him to see Dr. Lau.

Only the twins[,] Karen and Sharon[,] ... complained of headaches and loss of memory beginning in December 1993. However, contrary to their later claims that the symptoms were the result of exposure to the lead, arsenic and mercury, metals [sic], their own medical records showed that those complaints, if real, were the result of a December 6, 1993 motor vehicle accident in which the twins claimed that they sustained head injuries and for which they sought extensive medical care even after they moved from the cottage. [23] At trial, although in support of their claim

---

23. At trial, Karen related that she and her sister, Sharon, were involved in a motor vehicle accident in 1993: "My sister was driving, I was in the passenger seat, and a Jeep—it was a hit-and-run accident, and the Jeep fled the scene."

When asked whether Karen recalled having headaches after accident, she replied that "I still remember having headaches." However, Karen indicated that she also had headaches before the accident.

that the cottage caused their illnesses, they would "recall" minutia about the condition of the cottage, they would feign failure to recall their extensive treatment for what they claimed at the time were serious head injuries.

### 3. Post–Cottage

David['s] medical records show a sixteen year gap in health care from April 1, 1981, and March 6, 1997, when he was seen by Dr. Lau at his father's insistence. At the time, David ... denied any history of headaches, nausea or stomach problems.

Urologist Dr. Lattimer examined and tested David ... at his father's insistence, and fear of fertility problems. However, the laboratory test results were normal[.]

....

Like his brother, Tenny ... did not seek health care for ten years until after the lawsuit was filed. The Chos argued that urologist Dr. Joseph McEvoy concluded that Tenny ... had fertility problems. However, there is no evidence that Dr. McEvoy was able to give an opinion to a reasonable degree of medical probability that exposure to lead, arsenic and mercury was the cause, and admitted that there were a number of other possible causes.

....

At their father's insistence, ... Karen and Sharon ... submitted to evaluation by gynecologist Dr. Kenneth Vu. Karen ... gave a history having headaches, but did not disclose that they had begun only after the 1993 motor vehicle accident. Dr. Vu concluded that the headaches were not abnormal and tended to be around the time of menses. Based on the results of laboratory tests he ordered, he concluded that her hormone levels were normal for her age group.

More significant were Dr. Vu's observations of the father-daughter relationship[ ] and interaction. Calvin ... demanded to be present during Dr. Vu's interviews, and rather than allow his daughters to provide medical history, he insisted on doing so.... Like her sister, Sharon['s] fertility test results were also normal.

Based upon the foregoing FOFs, the trial court ruled in favor of the State, finding that:

59. There is no credible evidence of [the Chos]' toxic exposure to arsenic, lead or mercury from [the State]'s cottage.

60. There is no credible evidence of any physical or psychological injury to any of the [Chos] as a result of arsenic, lead or mercury from [the State]'s cottage.

61. There is no credible evidence of economic injury to any of the [Chos] as a result of arsenic, lead or mercury from [the State]'s cottage.

Irrespective of the trial court's erroneous decision to reconsider the initial sanctions order, we agree with the trial court's above findings inasmuch as (1) the Chos fail to challenge any of the FOFs and (2) we refrain from interfering in the trial court's determinations of credibility of the witnesses and the weight of the evidence. Indeed, as the State argued on appeal:

[T]he laboratory test results of samples from Calvin Cho during the time the Chos lived in the cottage showed negative findings of lead and arsenic, and fluctuating mercury levels which Drs. Endicott, Cupo, and Tardiff concluded were due to diet undercuts the Chos' argument regarding causation.

Dr. Ewing's admission that[,] when Calvin Cho was pursuing his workers' compensation claims for "chemical sensitivity," and staying at home in the cottage, instead of getting more ill he was actually getting better also undercuts causation. The lack of any evidence recorded during the period the family lived in the cottage of ailments, illnesses and symptoms suffered by his wife and children that can be attributed to the metals further undercuts causation.

... [T]he test results of samples taken from all of the Chos after they had moved from the cottage which showed that the metals were either not detected, or that the levels were fluctuating, and sometimes even increasing the longer they had been away from the cottage also proves a source of other than the cottage.

The above alone was enough to support the [trial] court's findings and conclusions, but there was much more. The [trial]

court chose either to disregard the testimony of the Chos' expert toxicologist Dr. Massaro, or at least to give more weight to the testimony of occupational and environmental medicine specialist Dr. Cupo, and the State's toxicologist Dr. Tardiff. There is ample support for the [trial] court's decision.

Accordingly, we believe the Chos failed to meet their burden with respect to the causation element of negligence. Consequently, we hold that the ICA, ultimately, was correct in affirming the trial court's conclusion and judgment in favor of the State.

## IV. *CONCLUSION*

Based on the foregoing, we affirm the ICA's May 8, 2007 judgment on appeal.